**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                    Case No.: 3:17-cr-52-J-20MCR

AMBROSIO MORAN-RAMOS
_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on the Defendant's Motion to Suppress

Physical Evidence and Statements (the "Motion") (Doc. 31), and the

Government's response in opposition to the Motion (Doc. 34). An evidentiary

hearing was held before the undersigned on September 15, 2017.

## I.    Background

On March 30, 2017, the grand jury returned a one-count indictment against

the Defendant charging him with illegal re-entry into the United States in violation

of 8 U.S.C. §§ 1326(a) and 1326(b)(1). (Doc. 14.) Specifically, the Defendant

was allegedly deported from the United States on June 23, 1997, subsequent to a

felony fraud conviction on May 25, 1997, and was then found unlawfully present

in the United States without first having obtained consent of the Attorney General

---

[1] "Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2); *see also* 28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02(a). "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).

or the Secretary of Homeland Security for the United States.  (*Ia.*)  On July 31, 2017, the Defendant filed the instant Motion seeking to suppress any statements made by him to law enforcement officers on March 20, 2017, as well as any fingerprint exemplars or biometric data obtained on that date.  (Doc. 31.)  The Court granted the Defendant's two requests to continue the status conference and trial in this matter.  (Docs. 38 & 46.)  The status conference is currently set for November 15, 2017 and the trial is currently set for the trial term commencing on December 4, 2017.  (Doc. 46.)

## II.    Evidence Presented at the Hearing

During the evidentiary hearing, the Government presented the testimony of United States Border Patrol ("USBP") field agent Charles Stephens ("Agent Stephens"), who participated in a transportation check at the Greyhound bus terminal in downtown Jacksonville, Florida on March 20, 2017, which led to the arrest of the Defendant.  The Government also entered nine (9) exhibits into evidence, including a DVD video and eight photographs of the bus terminal.  The Defendant presented the testimony of his son, Herman Carlos Ramirez.  The Defendant also entered two exhibits into evidence, including a photograph of the inside of the bus terminal with Mr. Ramirez's markings indicating his recollection of the positions of the parties during the relevant conversation, and a document

entitled "Warning as to Rights in an Administrative Proceeding."[2]  The

undersigned summarizes relevant portions of the testimony below to provide

factual context to this Report and Recommendation.

### A.    Agent Charles Stephens's Testimony

Agent Stephens has been employed with the USBP for twenty-nine (29)

years.  (Tr. 6.)  In his time with the USBP, Agent Stephens has held the position

of field agent, supervisory field agent, watch commander, field operations

supervisor, special operations supervisor, patrol agent in charge, assistant chief,

immigration inspector, supervisory immigration inspector, port director, and, on an

acting basis, deputy chief and chief.  (*Id.*)  On March 20, 2017, Agent Stephens

held the position of field agent and his job duties included patrolling the border

and making arrests of illegal aliens. (*Id.*)

On that date, Agent Stephens was instructed to go to the bus terminal by

his supervisor to look out for an absconding crewmember from a foreign-flag

vessel.  (*Id.*)  At approximately 8:00 a.m., Agent Stephens and USBP agent

Rafael Torres ("Agent Torres) arrived at the bus terminal.  (Tr. 7-8.)  The agents

were wearing their standard USBP issued uniform, Kevlar vests, and their

standard gun belt that included a holstered firearm, a pair of handcuffs, a steel

baton, and a tourniquet.  (Tr. 8.)  The agents parked their vehicle in the back of

---

[2] The undersigned refers to the Government's exhibits as "Govt. Ex. __" and the
Defendant's exhibits as "Def. Ex. __."

the bus terminal, where the buses pull in, and entered using the Forsyth Street doorway.[3] (Tr. 8-9; Govt. Ex. 2 & 3.) Once inside the bus terminal, the agents walked from the Forsyth Street doorway to the Pearl Street doorway, speaking with several people along the way regarding their citizenship status. (Tr. 9-10, 16; Govt. Ex. 1.) Agent Stephens testified that the agents walked a particular path that day in order to speak to individuals, which consisted of: (a) first walking down the ramp from the Forsyth Street entrance to the food court, (b) then walking back up the ramp and straight through the hallway where the benches and bus gates are located, and (c) then turning and walking straight towards the Pearl Street doorway. (Tr. 9-18, Govt. Ex. 1-8.) Prior to speaking with the Defendant and Mr. Ramirez, Agent Stephens spoke to most of the twenty (20) to thirty (30) individuals inside the bus terminal that morning regarding their citizenship.[4] (Tr. 39, 46-47.)

When Agent Stephens started his approach towards the Pearl Street doorway, he noticed two individuals, later identified as the Defendant and Mr. Ramirez, standing in a rigid manner against the wall between the ATM machine and the pay phones. (Tr. 19; Govt. Ex. 8.) Agent Stephens and Agent Torres

---

[3] Two separate doorways exist by which a member of the public can access the bus terminal; one doorway is located on Forsyth Street and another is located on Pearl Street. (Tr. 12; Govt. Ex. 3 & 9.)

[4] Agent Stephens testified that he tries to speak with everyone in the bus terminal, but avoids approaching people conducting business at the ticket counter, people using the restrooms and people eating at the food court. (Tr. 46-47.)

approached the Defendant and his son in an effort to speak with them.  (Tr. 20.)

As the agents approached, the Defendant and Mr. Ramirez walked away from the

wall and turned to face Agent Stephens so that the Defendant and Mr. Ramirez's

backs were to the Pearl Street doorway.  (Tr. 20, 58.)  Agent Stephens testified

that Agent Torres was standing to his side and slightly behind him, and that Agent

Torres did not converse with the Defendant or Mr. Ramirez during the initial

conversation.  (Tr. 20, 24, 57-58.)  Agent Stephens estimated that the

conversation took place between twenty (20) feet and sixty (60) feet from the

Pearl Street doorway.  (Tr. 25, 45; *see also* Gov't Ex. 9.)

Agent Stephens greeted Mr. Ramirez in English, who was standing in front

of the Defendant (closest to the ATM machine) as the agents approached.  (Tr.

21, 58.)  Mr. Ramirez responded to the greeting and then asked in English, "Why

are you talking to us?"  (Tr. 21.)  Agent Stephens responded in a conversational

tone, "Well, I'm a border patrol agent and I'm conducting an immigration

inspection for this terminal."  (*Id.*)  Agent Stephens then asked Mr. Ramirez

whether the two men were traveling together and, when Mr. Ramirez responded

in the affirmative, Agent Stephens asked the Defendant whether he spoke

English.  (*Id.*)  The Defendant did not respond to the question, but only looked at

Agent Stephens and smiled.  (*Id.*)  Agent Stephens, who is proficient in Spanish,

then asked whether the Defendant spoke Spanish.  (Tr. 22.)  The Defendant

responded in the affirmative and told Agent Stephens that he was a citizen of

5

Mexico.  (*Id.*)  Agent Stephens then asked the Defendant whether he had immigration documents (an immigrant visa) that he could show to Agent Stephens.  (*Id.*)  The Defendant stated that he did not and Agent Stephens then asked whether the Defendant could not provide immigration documents to Agent Stephens because he did not have them in his current possession or because the Defendant did not possess immigration documents at all.  (Tr. 22-23.)  At that point, the Defendant admitted that he did not possess immigration documents at all.  (Tr. 23.)

According to Agent Stephens, the conversation lasted no more than a couple of minutes.  (Tr. 24.)  Agent Stephens further testified that during the conversation, he never raised his voice above a conversational tone, the agents never threatened the Defendant or Mr. Ramirez, the agents never used physical force against the Defendant or Mr. Ramirez, the agents kept their firearms holstered during the conversation, and the agents never handcuffed the Defendant or Mr. Ramirez.  (Tr. 23-24.)  Agent Stephens also confirmed that neither he nor Agent Torres blocked or otherwise impeded the pathway to the Pearl Street doorway during the conversation.  (Tr. 25-26.)

Once the Defendant confirmed that he did not have any immigration documents, Agent Stephens informed the Defendant that he would have to take the Defendant into custody to run biometric tests.  (Tr. 23.)  The agents walked the Defendant to their vehicle via the Forsyth Street exit and placed the

Defendant inside the vehicle.[5]  The agents then informed Mr. Ramirez that he was not under arrest and that he was free to leave, but that, as a courtesy, he could ride with the agents to the USBP station while the agents ran biometric tests on the Defendant.  (Tr. 26-27.)  Mr. Ramirez elected to travel with the agents to the USBP station located approximately seven (7) miles from the bus terminal.  (*Id.*)

Once at the USBP station, Agent Stephens obtained biographical information from the Defendant and ran fingerprints through the USBP biometric system in order to identify the Defendant and to access prior records.  (Tr. 27-28.)  The records search confirmed the Defendant's identity, that the Defendant was assigned an alien registration number (meaning that the Defendant had prior immigration activity), and that the Defendant had been previously deported from the United States in 1997 as a result of a felony conviction and was granted voluntary return to Mexico.  (Tr. 28-29.)  Agent Stephens ran the Defendant's alien registration number through dispatch in Miami, which confirmed such information in more detail.  (Tr. 29-30.)  At that point, Agent Stephens's focus shifted from purely administrative to criminal and Agent Stephens advised the Defendant of his Miranda rights in Spanish per the standard USBP warnings form.  (Tr. 30-35.)  The Defendant invoked his right to refrain from further speaking with the agents and the agents refrained from further questioning the

---

[5] The agents did not handcuff the Defendant inside the vehicle.  (Tr. 27.)

Defendant.[6] (*Id.*) The agents continued to hold the Defendant in custody, but drive Mr. Ramirez back to the bus terminal with his luggage. (Tr. 77.)

## B. Mr. Ramirez's Testimony

Mr. Ramirez's testimony is entirely consistent with the testimony of Agent Stephens, save one relevant fact. (Tr. 65-78.) Mr. Ramirez testified that the agents were positioned during the conversation at the bus terminal so that one agent was standing between the Defendant and the Pearl Street exit. (Tr. 67-69, 70-72, 74; Def. Ex. 1.) Mr. Ramirez also testified that he felt uncomfortable while speaking to agent Stephens. (Tr. 72.)

## III. Analysis

The Defendant argues that the conversation at the bus terminal was not a consensual encounter and the agents lacked reasonable suspicion or probable cause to question the Defendant. As such, the Defendant contends that he was "in custody" at the bus terminal and that he should have received Miranda warnings at that time. Thus, the Defendant requests that the Court suppress the statements made at the bus terminal on March 20, 2017, as well as any biometric data taken or obtained thereafter, as such biometric data constitutes "fruit of the poisonous tree."

The Government responds that the agents engaged in a consensual encounter with the Defendant, and that the Defendant's admission was voluntarily

---

[6] The Defendant entered the English version of the form into evidence. (Def. Ex. 2.)

provided as the result of proper questioning by the agents.  The Government further argues that the Defendant was not "in custody" at the bus terminal and, once the Defendant admitted he was illegally present in the United States, the agents had probable cause to administratively arrest the Defendant and to obtain biometric data.  The Government urges the Court to deny the Motion.

### A.    The Conversation Constituted a Consensual Encounter

Consensual police encounters do not implicate the Fourth Amendment. "The mere fact that a law enforcement officer approaches an individual and so identifies himself, without more, does not result in a seizure." *United States v. Baker*, 290 F.3d 1276, 1278 (11th Cir. 2002).  Likewise, "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage – as long as the police do not convey a message that compliance with their requests is required." *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991) (internal citations omitted); *accord INS v. Delgado*, 466 U.S. 210, 216 (1984) ("[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation . . . [u]nless the circumstances of the encounter are so intimidating that a reasonable person would have believed he was not free to leave if he had not responded.").  The Eleventh Circuit listed the following factors for the Court to consider in determining whether a consensual encounter transformed into a "seizure" under the Fourth Amendment:

> whether a citizen's path is blocked or impeded; whether
> identification is retained; the suspect's age, education and
> intelligence; the number of police officers present; the display
> of weapons; any physical touching of the suspect; and the
> language and tone of the voice of the police.

*United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991). This is not an exhaustive list, *id.*, and the Court may consider other factors, including the place where the encounter occurred, *Bostick*, 501 U.S. at 437 (stating that where the encounter occurred is one factor in determining whether the encounter was consensual).

The undersigned finds that the circumstances indicate only a consensual encounter occurred. The agents approached the Defendant and his son at the Greyhound bus terminal, a public place. The Defendant was an older individual, forty-six (46) years old at the time of the encounter. Although two agents approached the men, only Agent Stephens questioned the Defendant. As Agent Stephens did with most of the twenty (20) to thirty (30) individuals at the bus terminal that day, he merely engaged in a conversation with the Defendant regarding his citizenship, as he is authorized to do pursuant to 8 U.S.C. § 1357, but did not affirmatively state that he believed the Defendant was engaging in any illegal activity.[7] The encounter was brief, lasting no more than a couple of

---

[7] Agent Stephens could not recall the results of his citizenship inquiries with the other individuals in the bus terminal that day, but stated he typically exchanges pleasantries and then questions individuals regarding their citizenship. (Tr. 47.) Agent Stephens testified that it is common for certain individuals to voluntarily show their passports or to state that

(continued...)

minutes. The agents did not block or impede the Defendant's path to the Pearl Street doorway, located a mere twenty (20) to sixty (60) feet from where the conversation took place. Agent Stephens did not raise his voice above a conversational tone and did not threaten the Defendant in any manner. The agents wore their standard USBP uniform and kept their firearms holstered during the conversation.[8] Finally, no physical touching of the Defendant occurred. The undersigned concludes that a reasonable person would have felt free to leave and, therefore, no Fourth Amendment violation occurred. *See, e.g., United States v. Caraballo*, 595 F.3d 1214, 1223 (11th Cir. 2010) (finding that initial questioning of the defendant was a consensual encounter where stop was brief, the officer asked the defendant for identification and asked the individuals whether they had a fishing license, there was no evidence that the defendant's path was blocked, that his identification was retained, or that he did not understand that the conversation was voluntary, and there was no indication that the officer displayed his weapon, physically touched the defendant or otherwise altered the language or tone of his voice); *United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006) (finding that interaction with the defendant was a consensual

---

[7](...continued)
they are immigrants, but forgot to bring their visas. (*Id.*)

[8] The Eleventh Circuit "accord[s] 'little weight' to the unremarkable fact that" the agents were in uniform and had a holstered firearm. *United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006).

encounter where the officer asked the defendant whether he had identification, spoke to the defendant in a conversational tone, kept his firearm holstered, and did not block or otherwise obstruct the defendant's exit); *United States v. Alvarez-Sanchez*, 774 F.2d 1036, 1041 (11th Cir. 1985) (affirming district court decision that encounter was consensual where officer requested that the defendant step into administrative office at Greyhound bus terminal and the defendant agreed, where the defendant voluntarily produced expired visa in response to officer's questions regarding nationality, where officer did not affirmatively state that he believed the defendant was engaged in illegal activity, and where the defendant retained control of his luggage and bus ticket).

The only factor disputed by the Defendant appears to be whether his pathway was impeded or blocked during the conversation at the bus terminal. Mr. Ramirez testified that an agent positioned himself between the Defendant and the Pearl Street exit. However, the undersigned finds the testimony of Agent Stephens more credible than the testimony of Mr. Ramirez. Mr. Ramirez, the Defendant's son, has a strong interest in the outcome of his father's immigration charges and his release from custody. Moreover, the positioning of the agents, as explained by Agent Stephens, appears to be more consistent with the path the agents utilized to navigate the bus terminal that day (*i.e.*, Agent Stephens testified that the agents turned and approached the Defendant and Mr. Ramirez while facing the Pearl Street exit). (Gov't Ex. 1.)

Notably, Mr. Ramirez did not testify that an agent blocked or otherwise impeded the Defendant's path so as to obstruct the Defendant's ability to exit the bus terminal. *Cf. Delgado*, 466 U.S. at 218-19 (rejecting the claim that merely positioning the agents near the buildings's exits constituted a seizure). Indeed, Mr. Ramirez testified that he could have exited the terminal that day, but chose not to do so.[9] (Tr. 75.) Although Mr. Ramirez testified that he felt uncomfortable while speaking to the agents (Tr. 72), the test is not a subjective one even assuming the Court can impute Mr. Ramirez's feelings to the Defendant. *Delgado*, 466 U.S. at 215 (holding that a consensual encounter can be transformed into a seizure only when, based on the circumstances, "a reasonable person would have believed that he was not free to leave").

To the extent the Defendant argues that the agents used selective enforcement techniques to target the Defendant for questioning, such argument is belied by Agent Stephens's testimony that he spoke to as many individuals as possible in the bus terminal that day regardless of race or nationality. (Tr. 39-40, 46-47.) The undersigned also rejects the Defendant's argument that the agents were so unique in stature so as to be *de facto* intimidating. Even if such a dubious position had some legal merit, the undersigned finds the stature of the agents (Agent Stephens– 5'10", 240 pounds; Agent Torres– approximately 5'9", 220 pounds) not to be so physically unique as to constitute automatic coercion.

_____

[9] The Defendant was standing closer to the exit than Mr. Ramirez. (Def. Ex. 1.)

(Tr. 35-36.)  Moreover, the evidence demonstrated that the agents used no intimidation or coercion tactics during the conversation at the bus terminal. Finally, the undersigned rejects the Defendant's argument that he was "in custody" at the bus terminal, as the questioning occurred in a public place, the questioning was brief, and the Defendant was not physically restrained during the questioning, as well as for the other reasons listed above.  *See Howes v. Fields*, 565 U.S. 499, 509 (2012) (stating that the relevant factors for determining whether a defendant is "in custody" are the location of the questioning, its duration, the statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning).

## B.    The Biometric Data Should Not Be Excluded

Taking into account the circumstances of the conversation at the bus terminal and the Defendant's admission to Agent Stephens that he was a citizen of Mexico and did not have immigration documents, Agent Stephens had probable cause to arrest the Defendant for being illegally present in the United States.[10]  *See United States v. Lyons*, 403 F.3d 1248, 1253 (11th Cir. 2005)

---

[10] The undersigned finds that it was reasonable for the agents to believe that the Defendant was likely to escape before a warrant could be obtained because the Defendant and his son were standing in the bus terminal with luggage close in time to when the buses reload at the terminal (Tr. 55, 68-69).  *See* 8 C.F.R. § 287.8(c)(ii) (authorizing an immigration officer to dispense with the warrant requirement when the officer has reason to believe that the person is likely to escape before a warrant can be obtained).  In any
(continued...)

(quoting *Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979)) ("'[T]he Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense.'"); *see also United States v. Moya-Matute*, 735 F. Supp. 2d 1306, 1345 (D.N.M. 2008) ("[O]nce [the defendant] told the agents he was from Honduras and did not have his immigration papers on his person, he gave sufficient information for them to have probable cause to arrest him under 8 U.S.C. § 1304(e)."). The agents could then obtain fingerprints of the Defendant as a result of the lawful arrest. *See United States v. Oliveras-Rangel*, 458 F.3d 1104, 1113 (10th Cir. 2006) (holding that "[c]ertain routine administrative procedures, such as fingerprinting, photographing, and getting a proper name and address from the defendant, are incidental events accompanying an arrest that are necessary for orderly law enforcement and protection of individual rights," and are not subject to the exclusionary rule); *Lloyd v. Marshall*, No. 2:08-cv-419-MEF, 2012 WL 1365452, at *8 (M.D. Ala. Mar. 21, 2012), *adopted in* 2012 WL 1365742, *aff'd*, 525 F. App'x 889.

In any event, the undersigned would not recommend exclusion of the biometric data (*i.e.*, fingerprints and prior immigration history) even if such data was obtained as a result of an unconstitutional arrest. In *United States v. Farias-*

---

[10](...continued)
event, such a finding is irrelevant to the question of whether the agents had probable cause to arrest the Defendant. *Moya-Matute*, 735 F. Supp. 2d at 1346.

*Gonzalez*, 556 F.3d 1181 (11th Cir. 2009), the Eleventh Circuit held that identity-related evidence should not be suppressed when offered in a criminal prosecution to prove identity. 556 F.3d at 1189; *see also United States v. Vasquez-Garcia*, 344 F. App'x 591, 592 (11th Cir. 2009). The Eleventh Circuit included as identity-related evidence both fingerprints and an individual's alien file. *Farias-Gonzalez*, 556 F.3d at 1189 (holding that an alien file "is not the product of any unconstitutional activity" when "it already exist[s] and [is] located in the records of a governmental agency"); *Vasquez-Garcia*, 344 F. App'x at 592. Here, the Government obtained fingerprints as part of the routine booking procedure and to identify the Defendant (Tr. 27-28, 82; Doc. 34 at 8-9). *See Oliveras-Rangel*, 458 F.3d at 1114 (stating that "fingerprints taken as part of a routine booking procedure following an arrest later determined to be illegal ordinarily will not be poisoned fruit of an illegal arrest and should not be suppressed"). The Government also searched the already-existing alien registration number and records to obtain further information. (Tr. 28-30.) The identity-related evidence should not be suppressed.

## IV. Conclusion

The undersigned finds that the conversation between Agent Stephens and the Defendant was a consensual encounter and, thus, no Fourth Amendment violation occurred so as to suppress the Defendant's admission. The undersigned also rejects the Defendant's argument that the Defendant was "in

custody" at the bus terminal and that the biometric data obtained at the USBP station should be suppressed as "fruit of the poisonous tree" for the reasons stated above.

Accordingly, it is respectfully **RECOMMENDED** that:

Defendant's Motion to Suppress (Doc. 31) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida, on October 12, 2017.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Harvey E. Schlesinger
United States District Judge

Counsel of Record